IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

LAMISS INVESTMENTS, LLC;
MITCH RICHARD; DONALD ALLEN;
HARRIET ALLEN HENRY; STEVEN
CAMPO; AND LONNIE SHANNON
MELTON                                                                                         PLAINTIFFS

v.                                                       CIVIL ACTION NO. 5:24-cv-00111-DCB-BWR

JEFFREY KELLER; KYLE W. FELLING;
TIMOTHY THOMPSON; BRIAN NEARN;
BRICO, INC.; AND PROBYSCI, LLC                                                        DEFENDANT

**PLAINTIFFS' MEMORANDUM SUPPORTING
RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL
ALTERNATIVE DISPUTE RESOLUTION AND STAY JUDICIAL PROCEEDINGS**

COME NOW, LAMISS Investments, LLC, Mitch Richard, Donald Allen, Harriet Allen Henry, Steven Campo, and Lonnie Shannon Melton (collectively, "Plaintiffs"), through counsel, and present their Memorandum Supporting Response in Opposition to the Motion to Compel Alternative Dispute Resolution and Stay Judicial Proceedings filed by Defendants Jeffrey Keller, Timothy Thompson, Brian Nearn, Brico, Inc., and Probysci, LLC (collectively, "Defendants"), as follows:

**INTRODUCTION**

This lawsuit arises from the fraudulent misrepresentations of Defendants utilized to lure Plaintiffs into making an almost $2 million investment in a company in which Defendants maintained 90% ownership (Rapid Analytics, LLC, or "Rapid"). Plaintiffs' allegations arise solely from the misrepresentations made by Defendants prior to and upon the execution of the Membership Interest Purchase Agreement ("MIPA") by which Plaintiffs made their investment. The MIPA does not contain a provision mandating any form of Alternative Dispute Resolution

("ADR"). Plaintiffs allegations do not arise from the Amended and Restated Limited Liability Company Agreement ("LLC Agreement"), as Defendants urge, which contains the alternative dispute resolution provision at issue. Accordingly, this Court should deny Defendants' Motion to Compel Arbitration and Stay Judicial Proceedings.

## FACTS

In October of 2023, Plaintiffs, in full reliance on the representations of Thompson, Keller, Felling, and Nearn, invested $1,900,000 in Rapid.[1] A little over two months later on December 23, 2023, the Mississippi State Department of Health came into Rapid's facility and issued a cease and desist letter citing a confidential source and alleging that Rapid's standard operating procedures and testing practices were not in compliance with the Mississippi Act creating the risk of the presence of pesticides in products to be released into the market.[2] This was a shock to Plaintiffs, as Defendants assured Plaintiffs that the lab was fully compliant.[3] The State ordered Rapid to cease operations and all products in the facility were seized.[4] In addition, all products in the market which had been tested were pulled from the shelf.[5] In January of 2024, MSDH ordered Rapid shutdown based on findings that Rapid's protocols, SOPs and procedures for testing were out of compliance with the Mississippi Act.[6]

The thrust of Plaintiffs' claims is explained within their Amended Complaint, as follows:

> 4.2   Thompson, Keller, Felling, and Nearn lured Plaintiffs to invest in Rapid through misrepresentations to Plaintiffs that they were fully knowledgeable of the Mississippi [Cannabis] Act and the regulations applicable to the Rapid testing facility, that the lab and all testing procedures were set up and operating in accordance with the [] Mississippi [Cannabis] Act and regulations including, but no limited to proper and SOPs. They further made clear that based upon their experience they could be relied upon for their knowledge in the industry. The

---

[1] *See* Amended Complaint at ¶3.4 [Doc. No. 3]
[2] *Id*. at ¶3.5.
[3] *Id*.
[4] *Id*.
[5] *Id*.
[6] *Id*.

2

scientists had set up cannabis testing labs in other states and were well experienced and capable of setting up the Rapid lab, and had done so. In order to lure Plaintiffs into investing their money in Rapid, Thompson, Keller, Felling and Nearn assured the Plaintiffs that Rapid's testing facility was set up by professionals, and scientists, and that the lab, including all SOPs were in full compliance with the Mississippi [Cannabis] Act. These Defendants also represented that Rapid's business was successful and ready to grow with Rapid enjoying a market share of more than 70% of the Mississippi Cannabis testing market.

    4.3  Thompson, Keller, Felling, and Nearn were aware that each of the Plaintiffs were relying on their representations when investing. These Defendants were also aware that either they were unfamiliar with the Mississippi [Cannabis] Act or that the testing and other SOPs and protocols being employed by Rapid were not compliant with the Mississippi Act. Accordingly, they knew that the representations made by them to the Plaintiffs were false when made and they made the representations with knowledge of their falsity or with a complete and total regard for such falsity. Defendants lured Plaintiffs into investing in Rapid based upon the Defendants best interest and in disregard for the interest and rights of Plaintiffs.[7]

The document through which Plaintiffs' investment was consummated is the MIPA, which was executed on October 11, 2023 and contains no mandatory ADR provision.[8] Notably, the MIPA provides at Section 2.11 as follows, in pertinent part:

> 2.11. **Compliance with Laws; Permits**.
>
>   (a)  To the Knowledge of Company, the Company, nor any of its Members, is not and has not been in conflict with, in default or, with notice, lapse of time or both, would be in default, with respect to or in violation of any (i) statute, law, ordinance, rule, regulation or requirement of a Governmental Authority (each, a "**Law**") . . . applicable to the Company[.][9]

The MIPA defines the term "Knowledge" as follows: "'**Knowledge'** of Sellers or Company with respect to any fact or matter means the actual knowledge, after reasonable investigation, of Sellers or the Company's managers (as applicable) listed in the Disclosure Schedule."[10]

---

[7] *Id*. at ¶¶4.2-4.3.
[8] *See* Membership Interest Purchase Agreement, attached as Ex. A to Defendants' Motion to Compel Alternative Dispute Resolution and Stay Judicial Proceedings [Doc. No. 8-1].
[9] *Id.* at §2.11(a) (emphasis in original).
[10] *Id.* at §7.10(g) (emphasis in original).

3

**ARGUMENT**

Defendants urge this Court to stay all proceedings and compel the parties to perform the mandatory ADR provision located at §20.12 of Rapid's LLC Agreement.[11] The present dispute, however, does not arise from the LLC Agreement. Instead, Plaintiffs' fraud claims arise from the MIPA, which does not contain any mandatory agreement of any kind related to alternative dispute resolution, including but not limited to arbitration.

## I.   *Plaintiffs' Claims Arise from the MIPA.*

The MIPA constitutes the consummation and closing of Plaintiffs' $1.9 million investment, which Plaintiffs contend they were fraudulently lured into. Accordingly, the present lawsuit arises from the MIPA, not the LLC Agreement. The MIPA and the LLC Agreement are separate and distinct documents. Otherwise, there would have been no need to execute them as separate contracts. Nor does the LLC Agreement incorporate by reference the MIPA or otherwise contain any provision which would incorporate into the MIPA the arbitration agreement found within the LLC Agreement.

The best example of the important differences that make the MIPA and the LLC Agreement separate and distinct, requiring denial of the present motion, is found within the "Compliance with Laws" provision of the MIPA.[12] Even setting aside the verbal misrepresentations made by Defendants prior to consummation of Plaintiffs' investment, the MIPA contains an affirmative representation by Defendants (referenced as "Sellers" within the MIPA) to Plaintiffs that none of them were at the time of execution of the MIPA, nor had they in the past been, in violation or conflict with any law applicable to Rapid.[13] As explained above, it

---

[11] *See* Amended and Restated Limited Liability Company Agreement at §20.12, attached as Ex. B to Defendants' Motion to Compel Alternative Dispute Resolution and Stay Judicial Proceedings [Doc. No. 8-2].
[12] *See* Membership Interest Purchase Agreement at §2.11(a).
[13] *Id.*

4

was this and other pre-closing fraudulent misrepresentations by Defendants on which Plaintiffs relied to their detriment while being lured into making their $1.9 million investment (which essentially had gone up in smoke approximately 2 months after closing). Had Defendants not made this material mispresenting to Plaintiffs within the MIPA, Plaintiffs would never have executed the MIPA.

In material contrast, §19.7 of the LLC Agreement provides as follows, in pertinent part:

> 19.7 **Compliance with Applicable Laws and Regulations.** For so long as a Member is a Member of the Company, each Member agrees to abide by all of the laws, rules, and regulations of the State of Mississippi applicable to such Member because of the operation of the Company as a licensed medical marijuana business as such term is defined within applicable law.[14]

Accordingly, the LLC Agreement provides for the rights and duties among the Members of Rapid, subsequent to execution of the MIPA and after consummation of Plaintiffs' investment, on a going-forward basis. For example, the Sections contained within the LLC Agreement include the following:

- ARTICLE 1 – DEFINITIONS [among which the term "Knowledge" is not even defined];
- ARTICLE 2 – ORGANIZATIONAL MATTERS;
- ARTICLE 3 – CAPITAL CONTRIBUTIONS;
- ARTICLE 4 – ALLOCATIONS AND DISTRIBUTIONS;
- ARTICLE 5 – MANAGEMENT; OFFICERS;
- ARTICLE 6 – METHOD OF VOTING;
- ARTICLE 7 – MANAGER;
- ARTICLE 8 – TAX, ACCOUNTING, BOOKS AND RECORDS;
- ARTICLE 9 – ADDITIONAL MEMBERS;
- ARTICLE 10 – PRE-EMPTIVE RIGHTS;

---

[14] *Id*. at §19.7 (emphasis in original).

- ARTICLE 11 – TRANSFER OF UNITS;

- ARTICLE 12 – DRAG-ALONG RIGHTS;

- ARTICLE 13 – TAG-ALONG RIGHTS;

- ARTICLE 14 – WITHDRAWAL IN BREACH OF AGREEMENT;

- ARTICLE 15 – INDEMNIFICATION;

- ARTICLE 16 – DISSOLUTION AND WINDING UP;

- ARTICLE 17 – CONVERSION INTO CORPORATE FORM;

- ARTICLE 18 – INTELLECTUAL PROPERTY OWNERSHIP;

- ARTICLE 19 – REPRESENTATIONS OF MEMBERS [as opposed to "Sellers," as described within the MIPA]; and

- ARTICLE 20 – MISCELLANEOUS.[15]

The present lawsuit does not arise from the corporate formality matters referenced above. This simply is not the basis of Plaintiffs' allegations in the present lawsuit. Instead, Plaintiffs allegations exclusively concern Defendants fraudulent misrepresentations which occurred prior to and upon the closing of Plaintiffs' investment.

The bottom line is that Defendants, as drafters of both the MIPA and the LLC Agreement, chose not to include a mandatory arbitration provision within the MIPA. The two documents are separate and distinct. And the allegations of the present lawsuit do not arise from the LLC Agreement.

## II. *The Alternative Dispute Resolution Provision Drafted by Defendants Narrowly Applies Only to Disputes Arising Under the LLC Agreement.*

It is of utmost importance to carefully interpret the ADR provision urged by Defendants which is found within §20.12 of the LLC Agreement, as fully set forth below:

---

[15] *Id.*

20.12 **Alternative Dispute Resolution**.  Notwithstanding the provisions of Sections 20.10 and 20.11, the parties agree that any and all disputes *arising under this Agreement* that they are unable to resolve themselves shall be addressed solely and exclusively in the following manner:

(a)  Mediation.  The parties agree that they will endeavor to resolve any dispute through mediation, meaning a process in which a neutral mediator will meet with the parties, together and/or separately in the mediator's discretion, in order to assist the parties in reaching an agreement to resolve their dispute.

(i)  A mediator shall be selected by agreement of the parties.  If the parties are unable to agree on a mediator, the parties shall contact the American Arbitration Association ("AAA") and request the AAA recommend a mediator.  The AAA's recommendation of a mediator shall be binding on the parties.

(ii)  The parties commit to spending not less than six (6) hours of the mediator's time in a mediation session to seek a resolution.  Each party will be responsible for one-half of any mediator's fee, and neither party shall be entitled to recover any attorney's fees.  Unless the parties otherwise agree, the mediation shall be held in Adams County, Mississippi.

(iii)  Both parties may be represented at the mediation by their attorneys, and each of the parties shall have present at the mediation one or more representatives with full authority to bind the party to any resolution that may be mediated.

(b)  Arbitration.  Second, if the dispute is not resolved at mediation, any controversy or claim arising out of or relating to this Agreement, or the alleged breach of the Agreement (excluding the breach provisions in Sections 14.1, 14.2, and 14.3), shall be conclusively settled by binding arbitration in accordance with the Commercial Arbitration Rules of the AAA, and a final judgment upon the award rendered by the Arbitrators (defined herein) may be entered in any court having jurisdiction thereof.  Unless the parties agree otherwise, the arbitration hearing shall be held in Adams County, Mississippi, before a panel of three (3) Arbitrators selected from the list of available Arbitrators provided by the AAA ("Arbitrators"), one of whom shall be named in writing by each party and the third shall be chosen by the two Arbitrators so selected.  All Arbitrators designated must possess at least three (3) years of experience in arbitrating for the AAA and be free of conflicts-of-interest as determined by the American Bar Association Code of Judicial Conduct.  The parties agree that, in the event of arbitration, the prevailing party shall be entitled to award of its reasonable attorneys' fees and costs. EACH OF THE PARTIES AGREES TO WAIVE ANY AND ALL RIGHT TO A JURY TRIAL IN ANY ACTION ARISING FROM OR RELATING TO THIS AGREEMENT.[16]

---

[16] Amended and Restated Limited Liability Company Agreement at §20.12 (emphasis added).

7

Of utmost importance, the entire ADR sequence of steps found within §20.12 (of which arbitration is "second"), as set forth above, only applies to disputes "<u>arising under this Agreement</u> [the LLC agreement] that they are unable to resolve themselves." Therefore, only if the dispute arises under the LLC Agreement does the sequence of the ADR process even begin. As explained above, this action clearly arises under the MIPA, not the LLC Agreement. Also, the Fifth Circuit Court of Appeals in *Pennzoil Expl. and Prod. Co. v. Ramco Energy Ltd.* has instructed that "courts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." 139 F.3d 1061, 1067 (5th Cir. 1998).[17]

### III. This Court – Not the AAA – Should Determine Whether Plaintiffs' Claims Are Arbitable.

The present action is distinguishable from the cases cited by Defendants supporting their argument that the AAA should determine whether Plaintiffs' claims are arbitrable. In some instances involving arbitrations governed by the AAA rules, courts have discussed whether challenge on the basis of fraud is made to the contract at issue as a whole or specifically to an arbitration provision found within the contract when determining whether a court or an arbitrator should decide whether a dispute is subject to an arbitration clause. *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006). In this line of cases, if the arbitration provision at issue is not specifically challenged but instead the contract as a whole, courts have found that it is for the arbitrator to determine whether the dispute is arbitrable. *Id.*

From the outset, in *Anderson v. Virginia College, LLC*, the Fifth Circuit Court of Appeals undertook the task of determining whether the claims at issue were arbitrable even under

---

[17] Concerning the broader "related to" language found within subsection (b) of §20.12, where any ambiguity may exist, "the Court applies the meaning more favorable to the nondrafting party." *Mississippi Commn. on Envtl. Quality v. Bell Utilities of Mississippi, LLC*, 135 So. 3d 868, 878 (Miss. 2014).

8

circumstances where the AAA arbitration rules applied rather than referring this determination to AAA for resolution. 2012 WL 4052198, at *3 (S.D. Miss. Sept. 13, 2012) (unpublished). But much more importantly, Defendants' argument is inapplicable to the present case because Plaintiffs have not challenged the validity of the LLC Agreement nor anything within the LLC Agreement. The LLC Agreement has only been placed at issue by Defendants through the present motion But as explained herein, the LLC Agreement is irrelevant. Plaintiffs' claims do not arise from the terms of the LLC Agreement but instead find basis in the MIPA, and fraud in the inducement before and upon execution of the MIPA, which does not contain an ADR or arbitration provision. In this way, Defendants are improperly attempting to shoehorn in the ADR provision that they themselves chose not to include in the MIPA without ever articulating the means by which they assume the ADR provision found within the LLC Agreement somehow should be incorporated into the MIPA. "The burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *Wellness, Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (Miss. 2015). Accordingly, Defendants have failed to carry their burden of establishing the existence of an arbitration agreement within the MIPA.

Even assuming the existence of a valid, applicable ADR provision, Defendants themselves, as drafters of the LLC Agreement, chose to write §20.12 (entitled "**Alternative Dispute Resolution**") of the LLC Agreement in a manner such that the entire provision only encompasses "disputes arising under this [LLC] Agreement that they are unable to resolve themselves." Within §20.12, the first phase (§20.12(a)) is mandatory mediation of such disputes. Second, as set forth in §20.12(b), "if the dispute [which must arise under the LLC Agreement, as

expressly stated within §20.12] is not resolved at mediation," then arbitration is required. As shown, Plaintiffs' claims clearly do not arise under the LLC Agreement.

Where any doubt may remain, "courts 'will not assume that the parties agreed to arbitrate arbitrability unless the parties clearly and unmistakably provide otherwise.'" *Dunavant v. Rivercrest LP, LP,* 2020 WL 8409099, at *2 (S.D. Miss. Sept. 28, 2020) (quoting *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012)).

## IV. *No Meeting of the Minds Occurred Between the Parties To Arbitrate the Present Lawsuit.*

In ruling on a motion to compel arbitration, "the court must first determine whether the parties agreed to arbitrate the particular type of dispute at issue. *O'Shaughnessy v. Young Living Essential Oils, L.C.*, 810 Fed. Appx. 308, 311 (5th Cir. 2020) (unpublished) (citing *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012). "In answering this question, we consider: '(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.'" *O'Shaughnessy,* 810 Fed. Appx. at 311 (quoting *Carey*, 669 F.3d at 205). Importantly, the Federal Arbitration Act "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 99 (2012). "[C]ourts apply 'ordinary state-law principles that govern the formation of contracts' in determining whether an agreement to arbitrate is valid." *O'Shaughnessy,* 810 Fed. Appx. at 311 (quoting *Carey*, 669 F.3d at 205). Under Mississippi law, a meeting of the minds is essential for an agreement to be valid and binding upon the parties. *Davis v. Davis (Estate of Davis)*, 832 So.2d 534, 537 (Miss. App. Ct. 2001).

In *O'Shaughnessy*, the Fifth Circuit Court of Appeals affirmed a district court's determination that no "meeting of the minds" occurred among the parties with respect to

arbitration under circumstances even more favorable to Defendants than those that exist in the present case. 810 Fed. Appx. at 312. From the outset, there, unlike the present case, company policy and procedure documents ("P&Ps") were actually incorporated by reference into a member agreement which was at issue. *Id*. In the instant case, no such incorporation by reference exists in the MIPA. Further, in *O'Shaughnessy*, the clause at issue contained language broad language subjecting "any controversy or claim arising out of *or relating to*" the member agreement to arbitration. As explained above, in the present case, the ADR provision at issue (§20.12), under which the arbitration clause is found, applies only to claims arising under the LLC Agreement. Even so, the court determined as follows:

> The P&Ps, incorporated by reference into the Agreement, contain the following pertinent language: "If mediation is unsuccessful, *any controversy or claim arising out of or relating to the Agreement, or the breach thereof, will be settled by arbitration.*" (emphasis added). This language is in direct conflict with the Jurisdiction and Choice of Law clause in the Agreement that "Any legal action concerning the Agreement will be brought in the state and federal courts located in Salt Lake City, Utah." Additionally, there is no limiting language in the Jurisdiction and Choice of Law paragraph, or anywhere else in the Agreement, suggesting that it only applies to disputes not subject to arbitration. Moreover, the Agreement, and not the P&Ps, contains the merger clause with language indicating that it supersedes other agreements. Consequently, our reading of these two conflicting provisions reveals that they cannot be harmonized.

*Id*. Accordingly, the Fifth Circuity affirmed the district court's finding that the arbitration provision at issue was unenforceable because no meeting of the minds among the parties occurred as to the issue of arbitration. *Id*.

In the present circumstance, the MIPA contains a jurisdictional clause that conflicts with the ADR provision found within the LLC Agreement. Section 7.3 of the MIPA provides as follows:

7.3     **Enforcement of the Agreement; Jurisdiction; No Jury Trial.**

(a)     The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in Adams County Chancery Court, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in Adams County Circuit Court, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties to this Agreement irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising under this Agreement brought by the other party to this Agreement or its successors or assigns shall be brought and determined exclusively in Adams County Chancery Court, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in Adams County Circuit Court. Each of the parties to this Agreement hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties to this Agreement hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve in accordance with this Section 7.3.; and, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (c) to the fullest extent permitted by the Law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum; (ii) the venue of such suit, action or proceeding is improper; or (iii) this Agreement, or the subject matter of this Agreement, may not be enforced in or by such courts. Each of Sellers and Buyer hereby agrees that service of any process, summons, notice or document by U.S. registered mail to the respective addresses set forth in Section 7.4 shall be effective service of process for any proceeding arising out of, relating to or in connection with this Agreement or the transactions contemplated hereby.

(b)     EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION

> OR OTHER PROCEEDING DIRECTLY OR INDIRECTLY ARISIN OUT OF, UNDER, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO CERTIFIES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.3.(b).[18]

As set forth above, the MIPA does not in any way reference arbitration or any type of mandatory ADR whatsoever. Also, nothing in the jurisdictional clause found within the MIPA indicates that it applies only to claims falling outside of the mandatory ADR provision found in the LLC Agreement. As explained herein, Plaintiffs' claims arise under the MIPA and fraud in the inducement of execution of the MIPA. Accordingly, the MIPA does not contain a mandatory ADR provision and instead expressly contemplates using the traditional forum through which lawsuits are adjudicated (the court systems of the State of Mississippi). As a matter of law, "[i]f a contract is unambiguous, a court must apply the plain meaning of the contract." *PriorityOne Bank v. Folkes*, 371 So. 3d 1284, 1288 (Miss. 2023). Here, the MIPA contains no ambiguity and the plain meaning is clear. Assuming solely for the sake of argument, however, that the Court finds §20.12 of the LLC Agreement relevant, at minimum there is a clear conflict between the jurisdictional clause of the MIPA and the mandatory ADR provision of the LLC Agreement. Therefore, no meeting of the minds occurred among the parties regarding the applicability of §20.12 of the LLC Agreement to the present case, and the arbitration provision is invalid and unenforceable.

---

[18] *See* Membership Interest Purchase Agreement at §7.3.

13

Defendants urge application of *Safer v. Nelson Fin. Group, Inc.* to support their contention that documents executed contemporaneously are assumed part of one transaction, making the ADR provision found within the LLC Agreement applicable to the MIPA. 422 F.3d 289, 296 (5th Cir. 2005). The circumstances of *Safer*, however, stand in sharp contrast to those presently before this Court. In *Safer*, the documents at issue did not include the original purchase agreement by which the nonmovants made their original investment into the subject company, as is the case in the present action. Nor did Safter involve fraudulent inducement claims arising from an original purchase agreement through which the nonmovant initially invested. Further, conflicting selection of court venue selection and jurisdictional provisions among the separate documents at issue did not exist in *Safer*. Finally, in *Safer*, the court determined as follows:

> Plaintiffs specifically allege that they were harmed by the *implementation* of the Defendants' investment advice (by, e.g., paying to the Defendants commissions, premiums, and transactional expenses when the Defendants purchased or sold investment products on their behalf). These allegations are clearly outside of the scope of the Advisory Agreement, but fall squarely within the language of the arbitration clause found in the New Account Information Forms pertaining to disputes regarding an "order or transaction."

*Id*. Here, as explained above, the opposite is true. Plaintiffs' claims in the present case clearly fall outside of the scope of the LLC Agreement because they did not arise from the LLC Agreement but instead from the MIPA. In urging *Safer*, Defendants also specifically misstate Plaintiffs' allegations by arguing Plaintiffs have alleged that "certain Defendants stated the Rapid lab, testing procedures, and Standard Operating Procedures would be in compliance with Mississippi law and regulations." This is incorrect. As set forth within the MIPA, even setting aside their verbal misrepresentations, Defendants represented that they were not, nor had they been in the past, in conflict with any applicable laws as of Plaintiffs' execution of the MIPA, by

14

which they made their $1.9 million investment. Only within the LLC Agreement did Defendants represent that for so long as they remained Members of Rapid, they each agreed, on a prospective basis, "to abide by all of the laws, rules, and regulations of the State of Mississippi applicable to such Member because of the operation of the Company as a licensed medical marijuana business as such term is defined within applicable law." Accordingly, Safer is inapposite to the present motion.

### CONCLUSION

"Finally, and critically, '[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Liberty Natl. Life Ins. Co. v. Hancock*, 369 So. 3d 66, 69 (Miss. App. 2023), reh'g denied (May 9, 2023), cert. denied, 368 So. 3d 815 (Miss. 2023) (quoting *Rogers-Dabbs Chevrolet-Hummer Inc. v. Blakeney*, 950 So. 2d 170, 176 (¶15) (Miss. 2007). *See also EquiFirst Corp. v. Jackson*, 920 So. 2d 458, 461 (Miss. 2006); *Pre-Paid Legal Services, Inc. v. Battle*, 873 So. 2d 79, 83 (Miss. 2004); (quoting *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986)).

For this as well as all of the reasons set forth herein, Plaintiffs respectfully pray that this Court deny Defendants' Motion to Compel Alternative Dispute Resolution and Stay Judicial Proceedings. Plaintiffs respectfully request any further relief the Court deems appropriate.

This, the 10th day of January, 2025.

          Respectfully submitted,

          LAMISS INVESTMENTS, LLC; MITCH RICHARD;
          DONALD ALLEN; HARRIET ALLEN HENRY;
          STEVEN CAMPO; AND LONNIE SHANNON
          MELTON

          */s/ Michael A. Heilman*
          Michael A. Heilman

OF COUNSEL:
Michael A. Heilman (MSB No. 2223)
E. Taylor Polk (MSB No. 103653)
Heilman Nisbett Polk, P.A.
Meadowbrook Office Park
4266 Interstate 55 North, Suite 106
Jackson, Mississippi 39211
Telephone:  (601) 914.1025
Facsimile:   (601) 944.2915
mheilman@hnplawyers.com
tpolk@hnplawyers.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification to all counsel of record.

This, the 10th day of January, 2025.

/s/ Michael A. Heilman
Michael A. Heilman